## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

CARLOS MONTELONGO-
GUZMAN

CRIMINAL CASE NO.

3:18-cr-00019-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Carlos Montelongo-Guzman ("defendant") is charged in a one-count indictment with intent to distribute a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. [Doc. 1].[1] Defendant has moved to suppress statements and evidence obtained following a traffic stop that occurred on August 15, 2018. [Docs. 18 & 19]. After an evidentiary hearing held on March 22, 2019,[2] the parties filed post-hearing briefs on the motions to suppress. See [Docs. 25, 28, & 29]. For the reasons that follow, it is

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 31] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)," and defendant also submitted exhibits at the hearing, which will be referred to as ("Def. Ex. ___)."

**RECOMMENDED** that defendant's motions to suppress, [Docs. 18 & 19], be **DENIED**.

## I.  STATEMENT OF FACTS

On August 15, 2018, at approximately 1:35 p.m., Georgia State Patrol ("GSP") Trooper T.J. Hamilton ("Trooper Hamilton") was watching northbound traffic on Interstate 85 "around mile marker 38" as part of the criminal interdiction unit responsible for that segment of the highway.  (Tr. at 8-9).  An Infiniti QX 80 SUV traveling in the far-right lane–later determined to be driven by defendant–caught Trooper Hamilton's attention when the driver "suddenly hit the brakes" after coming within view of Trooper Hamilton's patrol car.  (Tr. at 9-11, 31).  As the SUV drove by, Trooper Hamilton observed that both individuals inside "appeared to be nervous" and "were sitting upright in the seat."  (Tr. at 10, 33-34).  After passing him, the SUV began to "weave in [its] lane" and approached the rear of a tractor-trailer. (Tr. at 10-11, 35).  Trooper Hamilton testified that this behavior suggested the driver was engaged in "mirror driving," which he explained refers to the driver focusing on his rear-view mirror to see whether the patrol car was about to pursue him, rather than focusing on the road ahead.  (Tr. at 10).  In Trooper Hamilton's opinion, the SUV closed to within "a few vehicle" lengths behind the tractor-trailer and continued to "clos[e the] distance" before eventually changing lanes and

passing the tractor-tailor.  (Tr. at 11-12, 35).  The SUV was "definitely within" the standard three-second rule, which Trooper Hamilton testified was the rule "used as an evaluation of whether someone is following a vehicle too closely" and described it as the time it takes from when the "rear bumper of the vehicle in front" passes "a fixed object on the side of the road" until "the front bumper of [the] vehicle [behind] passes that same fixed object."  (Tr. at 11, 35-36).

Trooper Hamilton pulled onto the interstate and began following the SUV to verify the license plate and vehicle information.  (Tr. at 12).  After failing to receive any information from dispatch because the "in-car [Georgia Crime Information Center ('GCIC')] system was down," Trooper Hamilton continued to follow and kept pace with the SUV for about a mile.  (Tr. at 12-13, 39).  During that time, the SUV traveled at approximately 65 miles per hour through a construction zone, a stretch of the interstate where the posted speed limit was 60 miles per hour.  (Tr. at 12-13, 55-56).  Trooper Hamilton verified the speed of the SUV using the "Stalker Radar" affixed to his patrol car.  (Tr. at 13, 39).  He then initiated a traffic stop by activating his blue lights.  (Tr. at 13-15); see also (Gov. Ex. 1).

After the SUV came to a stop, Trooper Hamilton approached it on the passenger side and introduced himself, while standing at the front passenger window.  (Tr. at 14, 44; Gov. 1 at 1:11-1:22).  Defendant was in the driver's seat and

a female was in the front passenger seat.  See (Gov. Ex. 1).  Trooper Hamilton asked

if defendant had his license and whether the vehicle belonged to him.  (Tr. at 14;

Gov. Ex. 1 at 1:22-1:25).  Defendant replied the vehicle was a rental, so Trooper

Hamilton asked if defendant had any rental papers and added that he could not get

any information on defendant's tag.  (Tr. at 14; Gov. Ex. 1 at 1:25-1:39).  Defendant

handed Trooper Hamilton the rental agreement.  (Tr. at 19-20; Gov. Ex. 1 at 1:55).

Responding to a remark made by defendant, Trooper Hamilton explained that he

pulled defendant over for speeding and for following "that 18-wheeler pretty close."

(Gov. Ex. 1 at 2:22-2:45).  Defendant advised that he was headed to Atlanta, and

Trooper Hamilton asked defendant about the purpose of his trip.  (Tr. at 20-21; Gov.

Ex. 1 at 2:48-3:03).  Trooper Hamilton noticed that the rental agreement showed a

one-way rental from Texas to Rhode Island, so Trooper Hamilton inquired further

about that apparent discrepancy.  (Tr. at 20-21; Gov. Ex. 1 at 3:03-3:23).  Trooper

Hamilton attempted to determine whether defendant and the female passenger

resided in either California or Houston, (Gov. Ex. 1 at 3:34), and defendant indicated

that he lived in California, (Gov. Ex. 1 at 3:36); [Doc. 25 at 4].  Continuing the

background check, Trooper Hamilton told defendant to "hang on one second" while

he returned to his patrol car.  (Gov. Ex. 1 at 3:51).  For the next several minutes,

Trooper Hamilton can be heard on the dash-camera recording reentering his patrol

car and relaying information to the El Paso Intelligence Center ("EPIC") concerning defendant and his vehicle.[3]   (Gov Ex. 1 at 4:08-19:26).   Trooper Hamilton then received notice of a possible criminal arrest warrant for defendant.  (Gov. Ex. 1 at 14:32-15:19; Tr. at 20, 22).   He attempted to gain identification information by requesting either a photograph or detailed description.  (Gov. Ex. 1 at 16:40-16:50).

After learning about the arrest warrant, Trooper Hamilton returned to defendant's vehicle to continue their conversation.  (Gov. Ex. 1 at 19:33).  Defendant stepped out of the SUV and first showed Trooper Hamilton a copy of the rental registration on defendant's cell phone.   (Gov. Ex. 1 at 19:45-20:04).   Trooper Hamilton apologized for the delay, informed defendant that their system for running people was down, and asked if defendant had a pending arrest warrant out of California for a narcotics-related offense.  (Gov. Ex. 1 at 20:05-20:30).   Trooper Hamilton further explained that there appeared to be an active arrest warrant for someone with the same last name as defendant, his driver's license number, and his date of birth, but the name "Montelongo" appeared as a given name on the warrant instead of as part of a hyphenated last name.  (Gov. Ex. 1 at 20:30-21:30).  Trooper Hamilton also explained that he was waiting for a photograph from the warrant.

_____

[3] Trooper Hamilton testified that he "attempted to run [defendant's] driver's license through the GCIC system," but was "unable to get a return on his driver's license at that moment" since GCIC "was down," so he contacted EPIC "to run his driver's license."  (Tr. at 22-23, 47-48).

(Gov. Ex. 1 at 21:40).  Trooper Hamilton then asked defendant to run his fingerprints through a handheld scanner so that he could confirm whether the warrant was for defendant and proceeded to scan defendant's fingerprints.    (Gov. Ex. 1 at 21:55-23:33; Tr. at 25, 48). Defendant denied any knowledge of a 2013 arrest warrant. (Gov Ex. 1 at 23:15-23:28).

Trooper Hamilton returned to his patrol car with the scanner while defendant stood and waited on the side of the interstate.  (Gov. Ex. 1 at 23:33-28:00).  Trooper Hamilton later rejoined defendant and asked to try the fingerprint device a second time.  (Gov. Ex. 1 at 28:08-28:54; Tr. at 48-49).  While scanning defendant's prints, Trooper Hamilton asked defendant if there was anything illegal in the vehicle and received a negative response.  (Gov. Ex. 1 at 28:39-28:43).  After another brief trip to his patrol car, Trooper Hamilton returned and explained it could take a while to come back and that "the files [were] down for some reason."  (Gov. Ex. 1 at 29:01-30:00).   Trooper Hamilton stated that the warrant was for possession of dangerous drugs and that is why he had asked if there was anything illegal in the vehicle, and he then asked if defendant had a problem with him searching the SUV. (Gov. Ex. 1 at 30:05-30:20).  Defendant responded that he just wanted to get on the road and that he had not done anything illegal.  (Gov. Ex. 1 at 30:20-30:35).  Trooper Hamilton pointed out the traffic violations, which they further discussed, (Gov. Ex.

1 at 30:35-31:18), and the reasons why defendant's license appeared to be associated with an arrest warrant, (Gov. Ex. 1 at 31:18-33:08).  After defendant asked how long this usually takes, Trooper Hamilton stated he would go back to his patrol car and check.  (Gov. Ex. 1 at 33:12-33:26).  But, before Trooper Hamilton got back in his patrol car, defendant asked him to inform the female passenger what was going on. (Gov. Ex. 1 at 33:26-33:38).  Trooper Hamilton told the passenger the reason for the delay and then returned to his patrol car.  (Gov. Ex. 1 at 33:38-34:04).

Shortly thereafter, Trooper Munoz arrived on the scene and Trooper Hamilton summarized the situation to him, including that the "system [was] down" and he "was advised that there [was] a warrant associated to [defendant's] driver's license and his birth date," but the name was "showing Carlos Guzman" and "Montelongo, his second last name, [was] showing as a middle."  (Gov. Ex. 1 at 34:55-35:38; Tr. at 28).  While Trooper Hamilton remained inside his patrol car for another minute, Trooper Munoz spoke with defendant.  (Gov. Ex. 1 at 35:39-37:00).  Trooper Hamilton then exited his patrol car and placed defendant in handcuffs, explaining that the warrant had been confirmed, and that they would "now [] just wait to see if they want to come pick you up."  (Gov. Ex. 1 at 37:00-38:54, 40:56-41:05; Tr. at 26).

While waiting to receive information on whether the California warrant required extradition, Trooper Munoz explained to defendant that until extradition

was confirmed, "You are not technically under arrest." (Gov. Ex. 1 at 41:30-42:30). He reiterated that, "You're detained," and that defendant was only wearing handcuffs for officer safety. (Gov. Ex. 1 at 42:30-42:42). Defendant replied, "I understand that." (Gov. Ex. 1 at 42:34). Trooper Munoz continued by explaining, "Right now, we're assuming that . . . you're gonna drive away from here until they [California] say you can't . . . I've seen them not extradite people." (Gov. Ex. 1 at 43:43-44:02). During this exchange, defendant admitted driving above the 60 miles per hour speed limit. (Gov. Ex. 1 at 44:35; Tr. at 55).

Approximately 46 minutes into the traffic stop, Trooper Johnathan Nelms ("Trooper Nelms") arrived on the scene with his K-9 named Jack.[4] (Gov. Ex. 1 at 46:47; Tr. at 57, 60). At that point, Trooper Hamilton was still waiting to hear about extradition. (Gov. Ex. 1 at 47:10; Tr. at 27). Trooper Nelms and Jack conducted a free air K-9 sniff of the SUV by making two counterclockwise passes around the vehicle. (Tr. at 60-61, 68; Gov. Ex. 1 at 48:18-50:10). During the second pass, Jack gave a positive alert by sitting down near the "bottom right of the driver door." (Tr. at 69; Gov. Ex. 1 at 49:58). Trooper Nelm's handling of Jack that day complied with GSP policies and procedures. (Tr. at 61, 71).

---

[4] In April 2018, Trooper Nelms and Jack completed a six-week certification course administered by GSP. (Tr. at 58-59). Since that time, Trooper Nelms had worked continuously with Jack, sometimes deploying him as many as six times a week. (Tr. at 60).

As a result of the positive K-9 alert, Trooper Hamilton searched the SUV. (Tr. at 28; Gov. Ex. 1 at 52:33). He discovered 67 individually wrapped bundles of cocaine inside three bags that were located in the SUV. (Tr. at 28; Gov. Ex. 1 at 52:56; Gov. Ex. 5). Trooper Hamilton eventually issued two traffic citations to defendant for speeding and following too closely, which he did not complete until after he confirmed defendant had an active warrant and after Jack gave a positive alert. (Tr. 27, 56); see also (Def. Exs. 1A & 1B). Upon discovering the cocaine, Trooper Hamilton placed defendant and the female passenger under arrest and contacted federal authorities. (Tr. at 28-29). Before federal agents arrived on scene, Trooper Hamilton advised the female passenger of her Miranda[5] rights and spoke with her, (Gov. Ex. 1 at 55:29-57:45), and then Trooper Hamilton similarly advised defendant of his Miranda rights, (Gov. Ex. 1 at 1:12:35-1:13:12). In response, defendant stated that he wanted a lawyer present. (Gov. Ex. 1 at 1:13:12). Shortly thereafter, defendant indicated that he wanted to know his options and would speak with federal agents. (Gov. Ex. 1 at 1:14:00-1:16:42). At no point during the traffic stop did any officer un-holster a firearm or point a weapon at defendant, nor did anyone yell, threaten, or speak to defendant in an aggressive manner. See (Gov. Ex. 1).

---

[5] See Miranda v. Arizona, 384 U.S. 436 (1966).

Task force officer Jonathan Heeb ("TFO Heeb") of the High Intensity Drug Trafficking Task Force, arrived at the traffic stop sometime between 3:00 and 4:00 p.m. (Tr. at 72-73).  After speaking to one of the troopers, TFO Heeb met with defendant in the back seat of a patrol car.  (Tr. at 73-74).  Defendant was "really interested in what his options were," so TFO Heeb decided to continue the conversation at a nearby GSP office.  (Tr. at 74-76).  After arriving there, Trooper Nelms first met with defendant, advised him of his <u>Miranda</u> rights, and asked him if he would be willing to complete a handwritten witness statement.  (Tr. at 62; Gov. Exs. 2 & 3).  Defendant signed his initials next to each of the rights listed on the <u>Miranda</u> form and signed the waiver at the bottom of the page indicating his desire to "willingly make a statement."  (Gov. Ex. 2 (all caps omitted); Tr. at 63-64). Defendant then wrote and signed a separate witness statement form.  (Tr. at 64; Gov. Ex. 3).

At approximately 4:54 p.m., TFO Heeb began his formal interview of defendant by presenting him with a second <u>Miranda</u> waiver form.  (Tr. at 76; Gov. Ex. 6).  Defendant signed his initials next to each of the rights listed, wrote "Yes" twice to indicate that he both "understood [his] rights" and was "willing to answer some questions," checked a box indicating he had read the form, and signed that he "freely and voluntarily" was willing to answer questions. (Gov. Ex. 6).  At one point

during the hour-long conversation that followed, defendant gave TFO Heeb consent to search defendant's two cell phones.  (Tr. at 79-80).  Defendant provided the "passwords for his phones" to TFO Heeb and showed him specific items contained in his cell phones.  (Tr. at 80).  At no point did defendant withdraw his consent to search his phones, and he remained "very cooperative" throughout the interview. (Id.).  On September 4, 2018, TFO Heeb applied for and received a search warrant to extract data from the two cell phones.  (Gov. Exs. 7 & 8). The warrant was executed on September 12, 2018.  (Gov. Ex. 8 at 2).

## II.  DISCUSSION

Defendant contends that the "evidence obtained through the warantless search and any pre-search statements are due to be suppressed."  [Doc. 28 at 6]; see also [Docs. 18 & 19].  In particular, defendant argues that "there was not reasonable suspicion to support the traffic stop," and that "even if the stop were proper at its initiation, it was impermissibly prolonged."  [Doc. 28 at 6].  The government responds that the "traffic stop was justified by reasonable articulable suspicion that [] [d]efendant had committed two different traffic violations," that the "GSP troopers were further authorized to detain [] [d]efendant while they determined whether he was wanted for an outstanding arrest warrant," and that a "K-9 alert

later provided probable cause to search the vehicle for controlled substances." [Doc. 25 at 9].[6]

## A.   Probable Cause to Initiate the Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted). The "[t]emporary detention of

---

[6] Defendant originally challenged the voluntariness of his statements and moved to suppress "all post-arrest statements," [Doc. 18 at 2], and to suppress evidence obtained from the warrantless search of his cell phones, [Doc. 19]. At the conclusion of the evidentiary hearing, defendant elected to maintain and brief both motions.  (Tr. at 85-86).  In its post-hearing brief, the government argued that defendant "voluntarily consented to a search of his cell[ ]phones, and the agents later obtained a search warrant to retrieve data from the cell[ ]phones" and it agreed "not to use in its case-in-chief any statements [] [d]efendant made to law enforcement officers after [Trooper] Hamilton discovered cocaine in the trunk of [] [d]efendant's SUV." [Doc. 25 at 9].  Defendant's only argument in his response brief regarding the evidence obtained from his cell phones and any statements he made is that due to "the unreasonableness of the search, any statements obtained and the search of the cell phone[s] should be suppressed as fruits of the poisonous tree." [Doc. 28 at 6].  Thus, the Court will only address this argument, and defendant has abandoned his challenge to the voluntariness of his statements and any other basis for suppression of his statements and evidence obtained from the search of his cell phones.  See  United States v. Nuckles, Criminal Case No. 1:14-CR-218-ODE-AJB, 2015 WL 1600687, at *7 (N.D. Ga. Apr. 7, 2015), aff'd, 649 F. App'x 834 (11th Cir. 2016) (per curiam) (unpublished) (defendant "abandoned his argument relating to the voluntariness of his statements when he failed to raise the issue in his response brief"); see also United States v. Hicks, 546 F. Supp. 2d 1378, 1380 n. 2 (N.D. Ga. 2008), adopted at 1379 (defendant abandoned preliminary challenges to arrest and searches where, in his perfected motion, he sought only to suppress post-arrest statements and fruits of alleged unconstitutional activity).

individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable

13

suspicion. . . ."[7] <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); <u>see also</u> <u>United States v. Boyd</u>, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Woods</u>, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749-50 (1984); <u>see also</u> <u>United States v. Kelly</u>, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  <u>See</u> <u>United States v. Mwangi</u>, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); <u>see also</u> <u>United States v. Arango</u>, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior

---

[7] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" <u>United States v. Dunn</u>, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting <u>Wood v. Kesler</u>, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).

under the Fourth Amendment."); <u>Miller v. Harget</u>, 458 F.3d 1251, 1260 (11th Cir.

2006) (citations omitted) ("It is well-settled that an officer's subjective motivations

do not affect whether probable cause existed"); <u>United States v. Jimenez</u>, No.

2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that

"an officer's belief that he has probable cause or does not have probable cause is

simply not a pertinent factor" in determining whether an arrest is lawful).  That is,

"if the driver of a car has broken a traffic law, no matter how relatively minor, a

motion to suppress evidence cannot be based on the argument that the stop was

pretextual."  <u>United States v. Wright</u>, No. CR210-022, 2010 WL 4967468, at *1 (S.D.

Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation

omitted).

    In addition, "[t]he propriety of the traffic stop [] does not depend on whether

the defendant is actually guilty of committing a traffic offense."  <u>United States v.</u>

<u>Sicairos-Sicairos</u>, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at

*5 (N.D. Ga. July 11, 2011) (citation omitted).  "Instead, the relevant question is

whether it was reasonable for the officer to believe that a traffic offense had been

committed."  <u>Id.</u> (citation omitted).

    Defendant argues that the traffic stop was not supported by probable cause

or reasonable suspicion.  [Doc. 28 at 6-10].  The government contends that the stop

was justified by reasonable suspicion and probable cause since Trooper "Hamilton observed [] [d]efendant violating Georgia traffic laws by speeding and following too closely behind another vehicle." [Doc. 25 at 12].

"[F]irst, the Court finds that [Trooper Hamilton] had reasonable suspicion, if not probable cause, to stop the [SUV] for speeding in violation of O.C.G.A. § 40–6–181." United States v. Latimore, Criminal Action File No. 1:13-cr-287-TCB, 2014 WL 3109183, at *15 (N.D. Ga. July 7, 2014) (footnote omitted); see also O.C.G.A. § 40-6-181. "Although the [g]overnment did not introduce [Trooper Hamilton's] radar . . ., the undisputed evidence based on [his] testimony is that [defendant] was going [65 miles per hour in a [60]–miles–per–hour [construction] zone." Latimore, 2014 WL 3109183, at *15 (footnote omitted). In particular, Trooper Hamilton testified that on August 15, 2018, he was watching northbound traffic on Interstate 85 when he saw the SUV driven by defendant following a tractor trailer too closely, so he pulled onto the interstate and began following the SUV to verify the license plate and vehicle information. (Tr. at 8-12, 31, 35-36).

After failing to receive any information from dispatch because the "in-car GCIC system was down," Trooper Hamilton continued to follow and kept pace with the SUV for about a mile. (Tr. at 12-13, 39). During that time, the SUV traveled at approximately 65 miles per hour through a construction zone, a stretch of the

interstate where the posted speed limit was 60 miles per hour.  (Tr. at 12-13, 55-56).

Trooper Hamilton verified the speed of the SUV using the "Stalker Radar" affixed

to his patrol car.  (Tr. at 13, 39).  He then initiated a traffic stop by activating his blue

lights.  (Tr. at 13-15); see also (Gov. Ex. 1).  In connection with the stop, Trooper

Hamilton issued a citation to defendant for speeding in excess of maximum limits

in violation of O.C.G.A. § 40-6-181.  See (Def. Ex. 1B).  Defendant "has not presented

any evidence to rebut [Trooper Hamilton's] evidence that []he was speeding." Smith

v. Houston Cty. Sheriff's Office, Civil Action No. 5:12-CV-62 (MTT), 2013 WL

5937433, at *6 (M.D. Ga. Nov. 4, 2013).[8]

Having considered the evidence and testimony presented at the evidentiary

hearing, the "Court finds [Trooper Hamilton's] testimony [that he observed

defendant traveling in excess of the posted speed limit] reliable and credible."

United States v. Abarca, Case No. 1:12cr29-MW/GRJ, 2014 WL 12641951, at *6 (N.D.

Fla. Nov. 20, 2014); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir.

2004) (recognizing that credibility determinations are "within the province of the

factfinder"). Trooper Hamilton's "observations provided probable cause to conduct

the traffic stop for speeding," United States v. Acosta, 807 F. Supp. 2d 1154, 1196

(N.D. Ga. 2011) (citations omitted); see also United States v. Thomas, CRIMINAL

---

[8] In fact, during his interaction with Trooper Munoz, defendant acknowledged driving above the 60 miles per hour speed limit. (Gov. Ex. 1 at 44:35; Tr. at 55).

ACTION NO. 2:17-CR-28-RWS-JCF, 2019 WL 168672, at *1 (N.D. Ga. Jan. 11, 2019) ("agree[ing] with the [report and recommendation] that Deputy Holcomb had probable cause to stop Defendant's vehicle based on his observation of the vehicle . . . speeding in violation of O.C.G.A. § 40-6-181"); United States v. Shirley, Criminal Action File No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *5 (N.D. Ga. Nov. 10, 2010), adopted by 2010 WL 5390133, at *1 (N.D. Ga. Dec. 22, 2010) (citations omitted) (finding officer "had probable cause to believe that [defendant] was violating Georgia law regarding maximum speed limits"); United States v. Griffin, Criminal Action File No. 2:10-CR-016-RWS-SSC, 2010 WL 6815894, at *5 (N.D. Ga. Sept. 8, 2010), adopted by 2011 WL 2518808, at *1 (N.D. Ga. June 24, 2011) (citation omitted) (finding "the uncontradicted evidence show[ed] Officer Parker had probable cause to stop the Lincoln because he observed it traveling at speeds in excess of the posted speed limit"), which is "all that is necessary to conduct a traffic stop," United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citing Whren, 517 U.S. at 810). "The initial traffic stop of the [SUV] was therefore reasonable and not in violation of the Fourth Amendment." United States v. Martinez-Blanco,

CRIMINAL ACTION No. 1:06-CR-396 MHS, 2008 WL 11449038, at *1 (N.D. Ga. May 8, 2008), adopted by 2008 WL 11449039, at *1 (N.D. Ga. June 10, 2008).[9]

## B.   <u>Scope and Duration of the Traffic Stop</u>

Defendant next contends that "[e]ven if, *arguendo*, the stop [was] reasonable at its initiation, the search is nonetheless unreasonable because of the excessive duration of the stop" since the "stop lasted approximately 50 minutes between the pull-over of [the SUV] and the K9 alert." [Doc. 28 at 10]. The government disagrees, arguing that the length of the traffic stop was not unreasonable given defendant's outstanding arrest warrant. [Doc. 25 at 12].

Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting <u>Terry</u>, 392 U.S. at 20); <u>see also</u> <u>United States v. Cantu</u>, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished). The stop must be of limited duration and "the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal

---

[9] Because the Court finds that Trooper Hamilton had probable cause to initiate the traffic stop of defendant's vehicle based on his observation that he was speeding, the Court need not address defendant's assertion that Trooper Hamilton did not have reasonable suspicion to stop defendant for following too closely. <u>See</u> [Doc. 28].

activity." United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." Purcell, 236 F.3d at 1277 (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).  "Asking questions while in the process of writing out a citation or awaiting the response of a computer check, however, does not extend the duration or scope of a valid initial seizure." Garcia, 284 F. App'x at 794 (citing Purcell, 236 F.3d at 1279-80); see also Acosta, 807 F. Supp. 2d at 1196-97 (footnote and citations omitted) ("The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.").  In fact, "[t]he officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission." Cantu, 227 F. App'x at 785 (alteration, citation, and internal marks omitted).[10]  "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate

---

[10] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009) (citation omitted).

20

investigative purpose of the traffic stop is fulfilled." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted). That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted). As the Supreme Court has held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent. Rodriguez v. United States, 135 S. Ct. 1609, 1612-13 (2015) (all but first alteration in original) (citation and internal marks omitted).

After stopping defendant's vehicle, Trooper Hamilton approached the SUV on the passenger side and introduced himself while standing at the front passenger

window. (Tr. at 14, 44; Gov. 1 at 1:11-1:22). He asked if defendant had his license and whether the vehicle belonged to him. (Tr. at 14; Gov. Ex. 1 at 1:22-1:25). Defendant replied the vehicle was a rental, so Trooper Hamilton asked if defendant had any rental papers and added that he could not get any information on defendant's tag. (Tr. at 14; Gov. Ex. 1 at 1:25-1:39). Defendant handed Trooper Hamilton the rental agreement. (Tr. at 19-20; Gov. Ex. 1 at 1:55). Responding to a remark made by defendant, Trooper Hamilton explained that he pulled defendant over for speeding and for following "that 18-wheeler pretty close." (Gov. Ex. 1 at 2:22-2:45). Defendant advised that he was headed to Atlanta, and Trooper Hamilton asked defendant about the purpose of his trip. (Tr. at 20-21; Gov. Ex. 1 at 2:48-3:03). Trooper Hamilton noticed that the rental agreement showed a one-way rental from Texas to Rhode Island, so Trooper Hamilton inquired further about that apparent discrepancy. (Tr. at 20-21; Gov. Ex. 1 at 3:03-3:23). Trooper Hamilton attempted to determine whether defendant and the female passenger resided in either California or Houston. (Gov. Ex. 1 at 3:34). Continuing the background check, Trooper Hamilton told defendant to "hang on one second" while he returned to his patrol car. (Gov. Ex. 1 at 3:51). For the next several minutes, Trooper Hamilton can be heard on the dash-camera recording reentering his patrol car and relaying information to EPIC concerning defendant and his vehicle. (Gov Ex. 1 at 4:08-19:26).

Trooper Hamilton then received notice of a possible criminal arrest warrant for defendant.   (Gov. Ex. 1 at 14:32-15:19; Tr. at 20, 22).   He attempted to gain identification information by requesting either a photograph or detailed description. (Gov. Ex. 1 at 16:40-16:50).

After learning about the arrest warrant, Trooper Hamilton returned to defendant's vehicle to continue their conversation.  (Gov. Ex. 1 at 19:33).  Defendant stepped out of the SUV and first showed Trooper Hamilton a copy of the rental registration on his cell phone.  (Gov. Ex. 1 at 19:45-20:04).   Trooper Hamilton apologized for the delay, informed defendant that the computer system was down, and asked if defendant had a pending arrest warrant out of California for a narcotics-related offense.  (Gov. Ex. 1 at 20:05-20:30).   Trooper Hamilton further explained that there appeared to be an active arrest warrant for someone with the same last name as defendant, his driver's license number, and his date of birth, but with the name "Montelongo" listed as a given name instead of part of a hyphenated last name.  (Gov. Ex. 1 at 20:30-21:30).  Trooper Hamilton also explained that he was waiting for a photograph from the warrant.  (Gov. Ex. 1 at 21:40).  Trooper Hamilton then asked defendant to run his fingerprints through a handheld scanner so that he could confirm whether the warrant was for defendant and proceeded to scan defendant's fingerprints.  (Gov. Ex. 1 at 21:55-23:33; Tr. at 25, 48).

Trooper Hamilton returned to his patrol car with the scanner while defendant stood and waited on the side of the interstate. (Gov. Ex. 1 at 23:33-28:00). Trooper Hamilton rejoined defendant and asked to try the fingerprint device a second time. (Gov. Ex. 1 at 28:08-28:54; Tr. at 48-49). While scanning defendant's prints, Trooper Hamilton asked defendant if there was anything illegal in the vehicle and received a negative response. (Gov. Ex. 1 at 28:39-28:43). After another brief trip to his patrol car, Trooper Hamilton returned and explained it could take a while to come back and that "the files [were] down for some reason." (Gov. Ex. 1 at 29:01-30:00). Trooper Hamilton stated that the warrant was for possession of dangerous drugs and that is why he had asked if there was anything illegal in the vehicle, and he then asked if defendant had a problem with him searching the SUV. (Gov. Ex. 1 at 30:05-30:20). Defendant responded that he just wanted to get on the road and that he had not done anything illegal. (Gov. Ex. 1 at 30:20-30:35). Trooper Hamilton pointed out the traffic violations, which they further discussed, (Gov. Ex. 1 at 30:35-31:18), and the reasons why defendant's license appeared to be associated with an arrest warrant, (Gov. Ex. 1 at 31:18-33:08). After defendant asked how long this usually takes, Trooper Hamilton stated he would go back to his patrol car and check. (Gov. Ex. 1 at 33:12-33:26). But, before Trooper Hamilton got back in his patrol car, defendant asked him to inform his female passenger what was going on. (Gov. Ex.

1 at 33:26-33:38).   Trooper Hamilton explained the reason for the delay to the passenger and then returned to his patrol car.  (Gov. Ex. 1 at 33:38-34:04).

Shortly thereafter, Trooper Munoz arrived on scene and Trooper Hamilton summarized the situation to him.  (Gov. Ex. 1 at 34:55-35:38; Tr. at 28).  While Trooper Hamilton remained inside his patrol car for another minute, Trooper Munoz spoke with defendant.  (Gov. Ex. 1 at 35:39-37:00).  Trooper Hamilton then exited his patrol car and placed defendant in handcuffs, explaining that the warrant had been confirmed, and that they would "now [] just wait to see if they want to come pick you up."  (Gov. Ex. 1 at 37:00-38:54, 40:56-41:05; Tr. at 26).

While waiting to receive information on whether the California warrant required extradition, Trooper Munoz explained to defendant that until extradition was confirmed, "You are not technically under arrest."  (Gov. Ex. 1 at 41:30-42:30).  He reiterated that, "You're detained," and that defendant was only wearing handcuffs for officer safety.  (Gov. Ex. 1 at 42:30-42:42).  Defendant replied, "I understand that."  (Gov. Ex. 1 at 42:34).  Trooper Munoz continued by explaining, "Right now, we're assuming that . . . you're gonna drive away from here until they say you can't. . . I've seen them not extradite people."  (Gov. Ex. 1 at 43:43-44:02).

Approximately 46 minutes into the traffic stop, Trooper Nelms arrived on the scene with his K-9, Jack.  (Gov. Ex. 1 at 46:47; Tr. at 57, 60).  At that point, Trooper

25

Hamilton was still waiting to hear about extradition.  (Gov. Ex. 1 at 47:10; Tr. at 27).

Trooper Nelms and Jack conducted a free air K-9 sniff of the SUV by making two

counterclockwise passes around the vehicle.  (Tr. at 60-61, 68; Gov. Ex. 1 at

48:18-50:10).  During the second pass, Jack gave a positive alert by sitting down near

the "bottom right of the driver door."  (Tr. at 69; Gov. Ex. 1 at 49:58).

"[I]f the initial stop was legal, the [officer] had the duty to investigate

suspicious circumstances that then came to his attention."  Simmons, 172 F.3d at 779

(second alteration in original) (citation and internal marks omitted).  As previously

discussed, "the traffic stop was unquestionably legal and [Trooper Hamilton] legally

ran the [license] check that turned up the [California] warrant."  Id.  Thus, Trooper

Hamilton had "specific and articulable suspicion that the [person] named in the

warrant was [defendant] who had been stopped."  Id.  Trooper Hamilton then

diligently proceeded to verify whether the arrest warrant was for defendant by

confirming that defendant's first name and part of his last name, his driver's license

number, his birth date, and his state of residence matched the information associated

with the warrant; requesting a picture of the individual; asking defendant himself;

and scanning his fingerprints.  (Gov. Ex. 1 at 14:32-16:50, 20:05-28:54; Tr. at 20, 25,

48-49).  After confirming the warrant was for defendant, Trooper Hamilton inquired

whether California wanted to extradite defendant.  (Gov. Ex. 1 at 37:00-38:54, 40:45-

41:05; Tr. at 26-27, 69).  While waiting on this information, Jack gave a positive alert. (Gov. Ex. 1 at 49:58; Tr. at 27).   Under these circumstances, it was reasonable for Trooper Hamilton to detain defendant to investigate the warrant.  Simmons, 172 F.3d at 780; see also United States v. Simeon, 2:16-cr-00319-AKK-JHE-1, 2017 WL 2374097, at *4 (N.D. Ala. Mar. 26, 2017), adopted by 2017 WL 2351588, at *1 (N.D. Ala. May 31, 2017), aff'd, 752 F. App'x 822 (11th Cir. 2018) (per curiam) (unpublished) (noting that while the "initial purpose of the traffic stop was to investigate the speeding offense," in running the driver's information, the officer "determined [defendant] had an outstanding warrant," and thus, "in addition to investigating the speeding offense, [the officer] had a separate inquiry: whether the warrants against [defendant] were valid and, if they were, whether Columbus, Georgia would extradite [him] based on them"); United States v. Trestyn, No. 09-CR-216-J, 2010 WL 9459026, at *4 (D. Wyo. Jan. 21, 2010) ("Undeniably, after learning of the Georgia warrant for Herren, Officer Nykun was justified in continuing the detention to confirm the warrant.").

Defendant argues that the duration of the stop was excessive.  [Doc. 28 at 10]. "[T]he length of the delay consumed in the conduct of the investigative detention must have been 'sufficiently limited in scope and duration to remain within the bounds' permitted by Terry."  Simmons, 172 F.3d at 780 (quoting United States v.

Hardy, 855 F.2d 753, 758 (11th Cir. 1988)). "Several issues and circumstances are relevant to this analysis, including 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" Id. (quoting Hardy, 855 F.3d at 758); see also United States v. Hernandez, Criminal Case No. 1:12-CR-00322-AT-JFK, 2013 WL 7035606, at *7 (N.D. Ga. Aug. 12, 2013), adopted as modified by 2014 WL 111211, at *1 (N.D. Ga. Jan. 13, 2014), supplemented, 17 F. Supp. 3d 1255 (N.D. Ga. 2014).

As to the first factor, "the law enforcement purpose served by detaining [defendant] beyond the initial traffic stop was to confirm or reject, by computer check and follow-up [], whether [defendant] was the subject of the [California] arrest warrant." Simmons, 172 F.3d at 780. "[T]his was a method of investigation that was likely to confirm or dispel [Trooper Hamilton's] suspicions quickly, and with a minimum of interference." Id. (citation and internal marks omitted). Trooper Hamilton's diligence, as the government correctly contends, "is well-supported by the record as [he] attempted to check [] [d]efendant's warrant status within the first few minutes of the stop," and he "attempted to obtain information from a variety of sources, including GCIC, a fingerprint scanner, [EPIC], and [] [d]efendant himself." [Doc. 25 at 14 (citations and internal marks omitted)]; see also Simmons,

172 F. 3d at 780 (finding "the officers acted diligently with respect to the warrant" as "[t]hey tried to obtain further information from a variety of sources to clarify the identity of the 'Bobby Simmons' who was the subject of the warrant").[11]

"Turning to the next factor, the undersigned finds that the detention was not unreasonable in scope or intrusiveness." United States v. Aguiar, Criminal Indictment No. 2:05-CR-021-WCO, 2006 WL 8440907, at *8 (N.D. Ga. Nov. 21, 2006), adopted by 2007 WL 9724572, at *7 (N.D. Ga. Jan. 10, 2007). Defendant remained in the SUV for the first approximately nineteen minutes of the stop, and after Trooper Hamilton discovered the warrant, he asked defendant to step out of the SUV, and defendant then stood in front of Trooper Hamilton's patrol car until the warrant was confirmed about thirty-seven minutes into the stop, at which time he was placed in handcuffs for the troopers' safety. See (Gov. Ex. 1 at 19:45, 37:00, 42:30-42:42; Tr. at 22, 26); see also United States v. Lester, 477 F. App'x 697, 700 (11th Cir. 2012) (per

---

[11] Defendant challenges Trooper Hamilton's diligence, arguing that "[e]ven if the Court were to find it was reasonable for him to conduct further inquiry before placing [defendant] under arrest, there can be no question that his concerns were resolved by the point where he received the return from the fingerprint scan." [Doc. 28 at 15]. Defendant's argument that Trooper Hamilton was not diligent since he extended the detention to determine if he would be extradited prior to arresting him is without merit. See United States v. Byrd, 679 F. App'x 146, 150 (3d Cir. 2017) (unpublished), vacated and remanded on other grounds, 138 S. Ct. 1518 (2018) ("[W]e have little trouble concluding that, upon discovering a valid outstanding warrant from another state, an officer may extend a stop to inquire as to whether that other state wants the driver arrested for extradition.").

curiam) (unpublished) (finding detention was not overly intrusive where officers asked defendant to sit on officer's car with hands in view and was then handcuffed when he took a threatening posture); Simmons, 172 F. 3d at 780 (finding scope and intrusiveness of detention "relatively minor" where defendant sat in his own car); Aguiar, 2006 WL 8440907, at *8 (finding "detention was not unreasonable in scope or intrusiveness" where defendants "were handcuffed for officer safety").

Finally, the duration of the stop was reasonable.  "There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop," Nuckles, 2015 WL 1600687, at *17 (citation and internal marks omitted), "but detentions of less than one hour have been repeatedly upheld as reasonable," id. (collecting cases).  After stopping defendant and obtaining his driver's license and information about the rental SUV, Trooper Hamilton returned to his patrol car approximately four minutes into the traffic stop to begin the routine processes of writing citations and requesting checks of defendant's license for outstanding warrants. (Gov. Ex. 1 at 1:11-3:51).  Trooper Hamilton's computer system was down, which he later explained to defendant was the reason for the delay.  (Gov. Ex. 1 at 20:05-20:30, 29:01-30:00; Tr. at 22-23, 47-48); see also United States v. Robinson, 529 F. App'x 134, 139 (3d Cir. 2013) (unpublished) (footnote and citation omitted) ("Although the checks he performed to investigate [defendant's] criminal history

took 'longer than expected,' the delay was caused by circumstances beyond [the officer's] control, not by his own unreasonable actions."); Simmons, 172 F.3d at 780 (citing United States v. Rutherford, 824 F.2d 831, 833-34 (10th Cir. 1987)) ("upholding a one-hour traffic stop where nearly one-half of the time was occasioned by problems with police computer").  About fourteen minutes after defendant was initially pulled over, Trooper Hamilton learned of a possible arrest warrant for defendant.  (Gov. Ex. 1 at 14:32-15:19; Tr. at 20, 22).  "The remainder of the time that elapsed until the narcotics-detecting dog alerted to [defendant's SUV approximately fifty minutes into the stop] constitutes the additional [35] minutes consumed by the attempts to determine whether [defendant] was the subject of the [California] warrant [and whether California would extradite him]," Simmons, 172 F.3d at 781, and "there is no evidence [Trooper Hamilton] did anything to delay communications with [California] or prolong the stop at this point for any reason unrelated to the warrant[]," Simeon, 2017 WL 2374097, at *4 (rejecting defendant's argument that the stop was "impermissibly long," despite "the process of determining the answers to [whether the warrants were valid and if they were, whether Georgia would extradite defendant] took over thirty minutes" as "there [was] no evidence the [] officers did anything to delay communications with Columbus, Georgia or prolong the stop at this point for any reason unrelated to the

warrants"); see also Hardy, 855 F.2d at 761 (upholding investigatory detention that was delayed until a drug dog could arrive, which lasted approximately 50 minutes, since police acted with propriety and expedition). "The intervening development of probable cause based upon the dog's alert obviates the need for [the Court] to ascertain whether [defendant's] continued detention until . . . [California's] response was received, would have been reasonable." Simmons, 172 F.3d at 781. In sum, the Court "find[s] that the purpose of the detention, [Trooper Hamilton's] diligence in trying to prove or disprove that [defendant] was the subject of the [California] warrant, the limited scope of the continued detention beyond that warranted for a 'normal traffic stop,' and the overall length of the total detention, all place [defendant's] detention well within the bounds permitted by *Terry v. Ohio* and its progeny." Id.[12] Because the traffic stop was lawful and the subsequent search of

---

[12] Defendant argues that the "circumstances in this case are readily distinguishable from those in *Simmons*, and do not support a finding that the delay of the stop was reasonable here." [Doc. 28 at 12]. He asserts that Trooper Hamilton learned that "there was a felony warrant for a drug offense associated with [defendant's] driver's license number, birth[ ]date, and name" and that unlike the defendant in Simmons where the birth date did not match and "the warrant was from a location distant from the defendant's home," there was only one discrepancy in this case, and thus, "Trooper Hamilton could have conducted an arrest of [defendant] at that time" and allowed the passenger to leave with the SUV. [Id. at 12-13]. Defendant concludes that Trooper Hamilton purposefully delayed the formal arrest of defendant in order to prevent the passenger from departing with the SUV. [Id. at 14]. First, as the government points out, defendant's "allegations about Trooper Hamilton's personal motivations appear nowhere in the record and are purely speculative," [Doc. 29 at 4], and more importantly, "'[s]ubjective intentions

defendant's vehicle was authorized under the automobile exception after the K-9 alerted to the presence of drugs,[13] see Arizona v. Gant, 556 U.S. 332 (2009); United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006), it is **RECOMMENDED** that defendant's motions to suppress, [Docs. 18 & 19], be **DENIED**.[14]

---

play no role in ordinary, probable-cause Fourth Amendment analysis,'" United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004) (per curiam) (citation omitted). In addition, defendant's attempt to differentiate the discrepancies is unavailing. While the birth date, driver's license number, and first name matched, there was a discrepancy with the last name, and it was not unreasonable for Trooper Hamilton to detain defendant, instead of arresting him at that time, to investigate further whether the arrest warrant was for him. Defendant's argument essentially is that he should have been arrested earlier, but his contention is without merit. See Jones, 377 F.3d at 1314 (alteration in original) (quoting United States v. Cravero, 545 F.2d 406, 413 (5th Cir. 1976)) ("'[A] suspect has no constitutional right to be arrested earlier than the police choose.'"); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981).

[13] In his post-hearing brief, defendant did not contest the government's arguments regarding the automobile exception and the K-9 alert that supported the warrantless search of his vehicle. See generally [Doc. 28].

[14] Defendant also argues that because the stop was not lawful and was impermissibly prolonged, "any statements obtained and the search of the cell phone[s] should be suppressed as fruits of the poisonous tree." [Doc. 28 at 6, 17]. Under the doctrine of the "fruit of the poisonous tree," "evidence . . . discovered as a result of an earlier [constitutional] violation is excluded as tainted" in order to discourage future police misconduct. Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004). "[T]ainted fruit can grow only on poisonous trees," however; "that is, . . . derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation." Bruno v. Cunningham, No. 03 Civ. 937(MBM), 2004 WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citation omitted); see also id. (citing Oregon v. Elstad, 470 U.S. 298, 312 (1985)) ("Absent an underlying wrong, the fruit-of-the-poisonous-tree doctrine simply does not apply."). The Court

## III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that defendant's motions to suppress evidence, [Docs. 18 & 19], be **DENIED**.

There are no other pending matters before the Magistrate Judge,[15] and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 31st day of July, 2019.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

has not found evidence of a prior constitutional violation preceding defendant's statements in this case or the search of his cell phones, but has instead determined that the stop and subsequent detention were lawful.  Accordingly, defendant's argument in this regard is without merit, and his motions to suppress his statements and evidence from the search of his cell phones as fruits of the illegal stop are due to be denied.

[15] The government's motion for detention, [Doc. 9], is not ready for ruling because defendant remains under the writ of habeas corpus ad prosequendum, [Doc. 6].